55 CCPA

## Application of Franklin I. L. LAWRENCE and Michael J. Pohorilla.

### Patent Appeal No. 7888.

United States Court of Customs and Patent Appeals.

May 9, 1968.

---

554

Eugene F. Buell, Buell, Blenko & Ziesenheim, Pittsburgh, Pa., for appellants.

Joseph Schimmel, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

Before WORLEY, Chief Judge, and Judges RICH, SMITH, ALMOND, and KIRKPATRICK.*

RICH, Judge.

This appeal is from a decision of the Patent Office Board of Appeals [1] affirming the rejection of claims 41–52 in application serial No. 815,810, filed May 26, 1959, entitled "Organic Suspending Medium and Composition." No claim has been allowed.

The invention is a method of incorporating oil-insoluble, property-enhancing material such as detergents, antioxidants, antifouling agents, etc., into oleaginous compositions. The oil-insoluble material is first suspended in a certain kind of sulfur-condensed petroleum hydrocarbon resin and the suspension is then added to the oleaginous composition. Claims are directed to the method and the suspension initially prepared. Claim 51 is illustrative:

51. The method of stably dispersing a normally oil-insoluble material in an oleaginous composition comprising the steps of suspending said normally oil-insoluble material in a sulfur-condensed petroleum hydrocarbon resin by heating said oil insoluble material and resin, said resin containing more than 2 naphthenic rings per molecule and not more than 10% of wax type materials and produced by fractionation of heavy petroleum fraction with a liquified normally gaseous hydrocarbon, said resin having an ebullioscopic molecular weight in excess of about 1000 and an SUS viscosity at 210°F. of at least 900 and a bromine number less than 10 condensed by heating said resin at a temperature of at least 400°F. with at least about 5% by weight of elemental sulfur for a period sufficient to increase the SUS viscosity at 210°F. by at least 200 greater than that of the original resin, said sulfur condensed hydrocarbon be-

1. Consisting of Magil and Behrens, Examiners-in-Chief, and Gaston, Acting Examiner-in-Chief, opinion by Magil.

ing effective in a concentration of about 10% by weight to increase the viscosity index of a 60 at 100 SUS standard base oil derived from a paraffinic crude source at least ten viscosity index units more than does a like amount of the hydorcarbon starting material from which said condensation product is produced and adding the resulting suspension to the oleaginous composition.

Appellants' specification describes appropriate starting materials for the preparation of the sulfur-condensed petroleum hydrocarbon resin as "suitable crude oil fractions":

Appropriate fractions derived from crude oils of any source, including Pennsylvania crude oils, mid-continent crude oils, West Coast crude oils, Canadian crude oils, and the like, can be employed. All types of crude oils, including paraffin base crude oils, asphalt base crude oils, and napthenic crude oils provide suitable sources from which petroleum fractions useful in the production of the microgels of the invention can be derived.

\* \* \* \* \* \*

It is also preferred that the hydrocarbon starting materials contain an average of not more than about 50% aromatic carbon atoms. Hydrocarbons which contain an appreciable quantity of highly condensed ring systems, such as those hydrocarbons which are found in the phenol or furfural extracts of lubricating oils, are operable and are most appropriately employed as starting materials \* \* \*.

\* \* \* \* \* \*

Normal or vacuum distillation residual stocks and analogous fractions of paraffin base crude oils, such as Pennsylvania crude oils, are highly appropriate starting materials \* \* \*. Hydrocarbons precipitated by conventional propane precipitation processes from such residual stocks are particularly suitable.

Further refinement of such propane-precipitated, high-molecular-weight hydrocarbons, which include both light and heavy resin fractions, by extraction with furfural or phenol in conventional manner, yields a raffinate from which microgels of maximum effectiveness are produced. Conventional solvent extraction processes are utilized to obtain such raffinates.

Appellants' specification refers to a vast number of industrial applications for the invention. It mentions particularly the desirability of stable dispersions of various additives in lubricating oils. Among these additives are alkaline earth metal carbonates and boric acid.

The following references were relied on:

| | | |
|---|---|---|
| Campbell et al. | 2,485,861 | Oct. 25, 1949 |
| Cook | 2,614,985 | Oct. 21, 1952 |
| Jones et al. | 2,732,346 | Jan. 24, 1956 |
| Logan | 2,822,332 | Feb. 4, 1958 |

Georgi, "Motor Oils and Engine Lubrication" 170 (1950)

---

Campbell et al. discloses the dispersion of alkaline earth metals and their salts in lubricating oil. Alkaline earth metal carbonates are mentioned specifically. A dispersing agent is added to the composition to maintain the additive "in proper and permanent distribution in the oil, apparently as a true colloidal dispersion \* \* \*." The preferred dispersing agent is an alkali earth metal sulfonate soap. The specification points out:

It is understood that the amount of soap in the oil may be varied to give greater or lesser degree of detergency and varied also to permit colloidal dispersion of greater or lesser amounts of free alkali as demanded by the use of the oil.

Cook discloses a suspension of boric acid in a lubricant. Dispersing agents are also used to stabilize this suspension. Suitable agents include petroleum sulfonates, phosphatides and long chain carboxylic acid esters of polyhydric alcohols. Cook discloses that other additives, including detergents, may be present in the lubricating oil.

Jones et al. shows sulfur condensed hydrocarbons used as lubricant additives because of their detergent properties. These additives are prepared from a hydrocarbon feed stock containing a "substantial proportion of alkyl aromatics or naphthenic compounds," little, if any, olefinic compounds, and a minimum of waxy constituents. The feed stock's molecular weight is preferably over 300. Suitable sources are described:

Mineral oil base stocks provide a convenient source for feed stocks. Particularly desirable are lubricant base stocks having viscosities (Saybolt) above about 50 seconds, preferably in the range of about 75 to 500 seconds, at 210°F., and above about 300 to 750 seconds at 100°F., with A.P. I. gravities below about 30°. The base stock may be derived from mid-continent, coastal, and the like crudes, preferably those relatively rich in aromatic rings. The base stock, either distillates or residua, should be treated to remove waxy, asphaltic and olefinic constituents, if such materials are present in harmful amounts. Bright stocks, prepared by conventional deasphalting, dewaxing and acid-treating and/or clay-contacting of petroleum residuals, are quite effective feed stocks.

Solvent extracts or lubricant distillates and bright stocks, prepared by extraction of the materials with solvents such as phenol, furfural, $SO_2$, and other solvents by procedures well known to the art, are excellent feed stocks. These materials contain high concentrations of alkyl aromatic and naphthenic hydrocarbons. Solvent extracts produced from relatively low

boiling lubricant distillates will frequently have the high viscosity and low gravity characteristics needed to produce suitable sulfurized materials. The raffinates produced in solvent extraction, particularly those obtained from the more paraffinic crudes, such as Pennsylvania crudes and the like, are generally unsuitable for use in the present invention because of the relatively low content of alkyl aromatics therein.

The additives are then prepared by contacting the feed stock with sulfur at 375–500°F.

Logan also discloses the use of sulfur-condensed hydrocarbons as detergents in lubricating oils. These can be prepared from suitable petroleum fractions:

Petroleum fractions which contain substantially no asphalt either in a natural state or when deasphalted, and which have been solvent extracted to reduce the content of aromatic-type hydrocarbons therein and which have been dewaxed, are also suitable. These include lubricating oils produced from Pennsylvania, Mid-Continent, California, East Texas, Gulf Coast, Venezuela, Borneo, and Arabian crudes. The source of the crude from which the petroleum fraction is derived does not significantly influence the preparation or properties of the detergent material of my invention, provided the petroleum fraction has been prepared by subjecting the crude to certain necessary treatment to extrude certain undesirable materials therefrom.

The necessary treatment includes distillation, vacuum reduction, propane fractionation, solvent extraction with phenols, furfural, etc., and dewaxing. The treated fraction is then contacted with sulfur at 300–700°F.

Georgi teaches that detergent additives should properly be called dispersants since they maintain finely divided insoluble matter in a state of suspension.

The examiner rejected appellants' claims because, in his view, the use of detergents to suspend oil-insoluble mate-

rial in lubricants had been shown by Cook or Campbell et al. It therefore seemed obvious to him to use other detergents, viz., the detergents described in Jones et al. or Logan, in the very same way.

The board agreed, and, in response to appellants' contentions, added that the heating of insoluble material and resin required by the claims could not impart patentability thereto inasmuch as no criticality for it had been shown and for the further reason that a similar use of heat was disclosed in Cook and Campbell et al.

■ Much of appellants' argument here comes in the end to the proposition that there are no explicit directions in any of the references to make the claimed compositions. Such directions are not required. In re Siebentritt, 372 F.2d 566, 54 CCPA 1083 (1967). It is enough that appellants' composition and method would be obvious to one of ordinary skill in the art with the references of record before him.

■ Appellants also make a more particular argument to the effect that the references do not suggest the necessity of heating the oil-insoluble material and the resin to form the preliminary suspension. The board, as we have noted, did not see in appellants' specification any assertion of criticality for this heating step. The board, in other words, felt that the record did not indicate any necessity for the heating step and, therefore, did not warrant any inference of unobvious effect from such step. We agree.

Appellants argue that the inclusion of the heating step in every example provides a basis for their assertion of criticality. We think that the mere inclusion of a certain condition in every example is no implicit assertion of its criticality.

Appellants also controvert the examiner's statement that the sulfur-condensed hydrocarbon detergents of the prior art could meet the viscosity limitations of appellants' claims. The board addressed itself to this point:

> In our opinion, the art before us would suggest the use of the sulfurized products of Logan or Jones et al. as dispersants for oil-insoluble materials, thereby corresponding generally to the composition and method here claimed. Even if appellants' sulfurized hydrocarbon is not identical in every respect to the sulfurized hydrocarbon of Logan or Jones et al., * * * there is no showing that a change in the specific nature of the sulfurized hydrocarbon results in a significant unexpected change in the dispersion of the oil-insoluble material * * * or in the dispersing method * * *.

We do not think appellants' viscosity limitations distinguish over the sulfur-condensed hydrocarbons of the prior art. On this record, both sets of compounds would be expected to perform similarly in oleaginous compositions. It would be obvious to substitute the detergents of Jones et al. and of Logan in the lubricant dispersions of the prior art. It would be just as obvious to substitute detergents similar to those of Jones et al. and Logan. The mere restriction of the appellants' claims to a portion of the obvious subject matter, if indeed they are so restricted, cannot make them patentable.

The decision of the board is affirmed.

Affirmed.